**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NADIA MUSA-MUAREMI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 09 C 1824** |
| **v.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **FLORISTS' TRANSWORLD DELIVERY,** | ) | |
| **INC. (FTD),** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Nadia Musa-Muaremi filed her first amended complaint against Florists'
Transworld Delivery, Inc. ("FTD") alleging claims for *quid pro quo* sexual harassment, hostile
work environment, sex discrimination, and retaliation in violation of Title VII of the Civil Rights
Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").[1]  Before the court is FTD's
motion for summary judgment on each of the claims set forth in the complaint.  Musa-Muaremi
has filed a cross-motion for summary judgment on FTD's affirmative defense to vicarious
employer liability.  For the following reasons, FTD's motion [#138] will be granted in part and
denied in part and Musa-Muaremi's motion [#143] will be denied.[2]

---

[1] Plaintiff's first amended complaint asserts a single count titled "sexual harassment and gender
discrimination, retaliation and constructive discharge under Title VII including a claim of *quid pro quo*."
As the court explained in its order dismissing Count II of plaintiff's original complaint, constructive
discharge is not a separate claim under Title VII.  *See* Dkt. #24.  Accordingly, the court understands
plaintiff to assert four claims: *quid pro quo* harassment, hostile work environment, sex discrimination,
and retaliation.

[2] This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-
5(f)(3).  Venue is proper under 28 U.S.C. § 1391(b) because the parties reside in this district and the
events that gave rise to Musa-Muaremi's claims occurred in this district.

# SUMMARY JUDGMENT STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. *Id.* While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323. In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

# BACKGROUND[3]

Musa-Muaremi was employed by FTD from December 4, 2004 to May 21, 2007. On September 20, 2006, she was promoted to an Assistant Floral Buyer position in FTD's Fresh Flowers Department, where she worked under the supervision of Michael Martin. Martin was the Director of Fresh Flowers. On January 8, 2007, Musa-Muaremi was promoted to the

---

[3] The facts set forth in this section are derived from the statements of fact and supporting documents submitted by the parties to the extent they comport with Local Rule 56.1. *See* Minute Order dated Oct. 5, 2011. They are taken in the light most favorable to Musa-Muaremi.

position of Logistics Analyst, also in the Fresh Flowers Department. As a Logistics Analyst, Musa-Muaremi was supervised by Andrew Fordyce, the Fresh Flowers Procurement and Logistics Manager. Fordyce's conduct gives rise to the instant complaint.

As Musa-Muaremi's supervisor, Fordyce assigned her daily work assignments and approved requests for time off. Fordyce did not have authority to discipline, hire, or terminate employees. That authority resided with Martin, and Martin could only do so with the approval of the Human Resources Department. Fordyce could, however, make recommendations to Martin regarding disciplinary action. Fordyce could also make recommendations as to who should receive bonuses, subject to the approval of FTD's Chief Financial Officer and Chief Executive Officer and President. Musa-Muaremi testified that Fordyce frequently stated that he had the power to hire and fire and discipline employees and that he threatened her and other employees with discipline and termination. Pl.'s Ex. 1 ¶¶ 145, 149; Def.'s Ex. 1 at 171.[4] Michelle Fryer, a former FTD employee, similarly testified that Fordyce frequently threatened employees with termination. Pl.'s Ex. 26 ¶ 27. Aimee Bachman, another employee, also testified that Fordyce had the authority to fire and discipline employees. Pl.'s Ex. 30 at 109–110.

## I. Fordyce's Conduct Prior to May 1, 2007

As related by Musa-Muaremi and her witnesses, Fordyce engaged over an extended period of time in vulgar, harassing behavior towards Musa-Muaremi and others. Musa-Muaremi asserts that Fordyce behaved inappropriately as early as the summer of 2006, when she

---

[4] FTD argues that paragraph 145 of Musa-Muaremi's affidavit should be stricken because it is inconsistent with her deposition testimony. At her deposition, Musa-Muaremi was asked, "Did Mr. Fordyce ever threaten your job if you didn't engage in any sexual conversations with him?" She responded, "There was no direct threat." Def.'s Ex. 1 at 231–232. This testimony is not inconsistent with her affidavit, wherein she simply asserts that "Fordyce frequently threatened me and other employees with termination, [sic] discipline." Pl.'s Ex. 1 ¶ 145.

interviewed for the Assistant Floral Buyer position. Musa-Muaremi testified that Fordyce interviewed her and that he asked whether she was married or single. When Musa-Muaremi stated that she was married, Fordyce stated, "Now, you don't plan on getting pregnant anytime soon, do you?" Def.'s Ex. 1 at 173. Musa-Muaremi told Fordyce that she didn't think he was supposed to ask that type of question. Fordyce responded, "You take things too seriously. It won't work in this department." *Id.* at 174.

When Musa-Muaremi started work as a Logistics Analyst, she worked in a team of six women who were supervised by Fordyce. Three of the women received special treatment from Fordyce. He referred to these three employees as his "minions" because, in Musa-Muaremi's opinion, they did "whatever he asked them to." *Id.* at 154. Fordyce allowed these employees to take undocumented time off and work from home. He also took them out for lunches and cocktails.

Beginning in February 2007, Fordyce began to single Musa-Muaremi out for negative attention. Fordyce yelled at Musa-Muaremi in front of other employees. He also pulled her aside from other employees by snapping his fingers, pointing his finger at her, stating, "You," and then pointing to where he wanted her to go. Fordyce called Musa-Muaremi a bitch on several occasions. He also referred to other female employees as "bitches." In February or March 2007, Musa-Muaremi told Fordyce that his use of the word bitch was not appropriate. Fordyce responded, "You know you're a bitch." Pl.'s Ex. 1 ¶ 17.

In February 2007, Musa-Muaremi met with Martin because she had not received a raise at the beginning of the fiscal year. Martin told her that raises hadn't been provided due to budgetary constraints. He then said, "Let me ask you a question: Are you starving – are you

starving to put food on your table?" Def.'s Ex. 1 at 388. Musa-Muaremi responded, "Wow. Do

I need to be?" Martin told Fordyce about this conversation, and Fordyce started to mock Musa-

Muaremi. Fordyce told her that because she was a woman she could not be the "breadwinner" in

her family and that usually men get promotions and raises. *Id.* at 388. Fordyce began to repeat

the phrase, "Are you starving to put food on your table?" Other employees told Musa-Muaremi

that this was a line from a recruiting ad for Heavenly Bodies strip club. When Fordyce realized

that Musa-Muaremi knew what he was referring to, he started whispering "Heavenly Bodies"

when he saw Musa-Muaremi. Later, when a female employee in the sales team asked Fordyce if

he could provide change for a $20 bill, Fordyce told the employee to ask Musa-Muaremi because

"[she] has a lot of singles . . . you know." *Id.* at 389. The teasing continued "at random" for

weeks. *Id.* at 390.

In March 2007, Fordyce made two offensive comments while he and Musa-Muaremi

were on a business trip in Miami. Fordyce told Musa-Muaremi that if she wasn't able to find

cab to take her to the airport early in the morning she could "flash a taxi" to get a free ride. *Id.* at

223. He also asked whether she was "physically, emotionally and sexually happy" when they

were driving in a car together. *Id.*

FTD employees worked in a cubicle environment and Musa-Muaremi's desk was not far

from Fordyce's. As a result, she frequently heard him swear and use crass language. Fordyce

also engaged in sexually explicit phone calls while he was at his desk. On one occasion, Musa-

Muaremi overheard Fordyce talking on the phone with a woman who Musa-Muaremi believed to

be his girlfriend. Fordyce engaged in a graphic discussion of oral sex, sex toys, and sex with

multiple partners. Musa-Muaremi passed Fordyce a note that said that she could hear him, and

then walked away.  On another occasion, Musa-Muaremi told Fordyce that she didn't think his conversation was appropriate and Fordyce told her to "go buy earplugs."  *Id.* at 234.  Sometime in March 2007, Musa-Muaremi overheard Fordyce talking on the phone with a female recruiter and asking her about a "rabbit" vibrator and whether she had favorite sexual positions.  *Id.* at 223–24.

Fordyce told Musa-Muaremi that she should try to lose weight "because the Coke bottle body is out of style."   He suggested that she go to Weight Watchers meetings with two other female employees.  Fordyce also told Musa-Muaremi to stop eating a piece of candy because it was full of calories.

Musa-Muaremi testified that Fordyce frequently used the term "rape" in unnecessary contexts, as in "[L]ook at these prices on here that Queens Flowers is charging us . . . They are raping us."  *Id.* at 411.  Fordyce stopped making these comments after Musa-Muaremi and Martin told him that his language was offensive.  Fordyce also told Musa-Muaremi that she could not go on a business trip to Bogota, Colombia because she would probably be kidnapped and "get raped multiple times."  *Id.* at 417.

On one occasion, after a female employee had been working late at the office, Fordyce told a group of employees that she must have been working late "because she has no life.  Her boyfriend probably doesn't want to sleep with her.  Who would?  She's a whale."  *Id.* at 409.  Musa-Muaremi also overheard Fordyce tell another female employee that she should start saving money for a breast augmentation procedure.  *Id.* at 391.[5]

---

[5] FTD argues that Musa-Muaremi testified that she did not directly overhear this comment.  From her testimony, however, it appears that she was referring to a different conversation with Fordyce when she stated that she could not provide details because she was not present.  Def.'s Ex. 1 at 391–92.

Musa-Muaremi heard Fordyce state that he wanted to hire a physically attractive woman from another department to be a sales manager because she was "a knockout" and "a 10." *Id.* at 413. Fordyce became upset when the attractive woman was not hired into the department. The woman who was eventually hired for the sales position used a cane. Musa-Muaremi heard Fordyce refer to the new hire as "the cripple." *Id.* at 413. Musa-Muaremi told Fordyce that she didn't think this comment was appropriate. Fordyce responded, "She's useless because her legs can't go up in the air." *Id.*

On another occasion, Fordyce wanted to decorate one of his favorite employee's cubicles with confetti for her birthday. Some of the other women in the department told him that the confetti would be difficult for the cleaning lady to vacuum from the floor. Fordyce responded, "Well, I have something for her to suck on." *Id.* at 414.

Fordyce inappropriately referred to another female employee as a "whore." Musa-Muaremi was talking to the employee's seven-year-old daughter, who was visiting the office. Fordyce stood near Musa-Muaremi's desk and said that he "wonder[ed] if she [was] going to end up a whore like her mother." *Id.* at 418. Musa-Muaremi believed that Fordyce was referring to the fact that the girl's mother had been a "teenaged mother." *Id.* at 417.

 In April 2007, Musa-Muaremi heard Fordyce tell two other female employees who were on a team call to stop "rolling around in bed and playing around with [your] boyfriends." *Id.* at 270.

Fordyce also swore and raised his voice at two male employees, Brad Jensen and James Majka. Fordyce did not like Jensen and referred to him more than once as a "fucking idiot" and

called him fat. Fordyce would repeatedly punch his fist into his hand, apparently in anger or frustration, when he was around male and female employees.

## II.    Complaints About Fordyce Prior to May 1, 2007

### A.    FTD's Sexual Harassment Policy

FTD's Employee Handbook states that harassment based on gender is prohibited and that "abusive conduct or harassment" includes "derogatory comments, slurs, statements, jokes, or other objectionable behavior based on upon a person's race, age, sex, color, religion, disability, ethnicity, or other protected status." Def.'s Ex. 7 at 27. Employees who believe they have been subjected to sexual harassment are directed to report the offensive conduct immediately to their manager or to the Human Resources Department. *Id.* at 28. A manager who receives a complaint of sexual harassment should bring the complaint to the attention of the Human Resources Department. FTD will undertake an impartial investigation "immediately" after a complaint has been made. *Id.* Retaliation of any kind is prohibited under FTD's harassment policy and employees are directed to report any allegedly retaliatory act to their manager or to the Human Resources Department. *Id.* FTD also has an informal "open-door policy" which provides that an employee can raise any issue with the Human Resources Department without going to a manager.

All new employees, including Fordyce, reviewed FTD's anti-harassment policy during orientation. It is undisputed that Musa-Muaremi was aware of FTD's anti-harassment policy and that she knew that she could make complaints regarding sexual harassment or gender discrimination to the Human Resources Department or to her manager. She also took college level human resources courses while she was employed at FTD. As part of her course work she

learned about Title VII and that an employee can make a sex discrimination complaint to her employer's human resources department.

### B.      Musa-Muaremi's Complaints

Musa-Muaremi testified that she first told Angie Weld, the Manager of Human Resources, about Fordyce's alleged misconduct in August of 2006. She testified that she told Weld about Fordyce's comments during her interview for the Assistant Floral Buyer position and that Weld agreed that the comments were inappropriate. Weld offered to talk to Fordyce about his behavior, but Musa-Muaremi asked her not to say anything at that time. Musa-Muaremi also told Martin about Fordyce's interview questions and Martin responded, "[T]hat's his personality." Def.'s Ex. 1 at 171.

In November 2006, Musa-Muaremi told Weld that Fordyce was very loud in the office and that he had told her that people who worked for "dot coms" have "sticks up their but[t]s." *Id.* at 169. Musa-Muaremi stated that she was offended by this comment because she had previously worked for an internet company.

In early January 2007, when Musa-Muaremi met with Martin to have her midyear review for her work as an Assistant Floral Buyer, Musa-Muaremi expressed some misgivings about the possibility of working under Fordyce in the future. Musa-Muaremi told Martin that she had concerns about working under Fordyce because she had a "bad relationship" with him and he didn't treat the other employees well. *Id.* at 218.

At her deposition, Musa-Muaremi testified that in early February 2007, after she started working under Fordyce, she told Martin that Fordyce had called her a bitch. In her affidavit, she further asserts that she "complained to Martin on several occasions" in February, March, and

April 2007 and that each time Martin told her, "You need to manage him." Pl.'s Ex. 1 ¶¶ 51–54. Musa-Muaremi does not describe the substance of her complaints.

Musa-Muaremi also testified that, on two different occasions, she complained to Martin about Fordyce's sexually explicit phone calls. After the second complaint, Martin told Musa-Muaremi that he had talked to Fordyce in the past about being "more soft spoken" and that he had already discussed the inappropriate conversation with Fordyce. *Id.* ¶ 59.[6]

Sometime in March 2007, Musa-Muaremi was approached by Robert Meiner, another manager at FTD, who expressed concern about things he had heard about Fordyce's conduct towards Musa-Muaremi. Def.'s Ex. 1 at 351. Meiner suggested that Musa-Muaremi report Fordyce's conduct to the Human Resources Department. There is no evidence that Meiner approached anyone in the Human Resources Department on Musa-Muaremi's behalf.

Musa-Muaremi testified that she "went to HR several times" to complain about Fordyce's behavior after she started working as a Logistics Analyst. She could not remember her specific complaints, but she was certain that she had mentioned that Fordyce "ma[de] comments" and used "the B word." Def.'s Ex. 1 at 225.

On April 25, 2007, Musa-Muaremi told Amy Majka, the Director of Human Resources, that Fordyce was "crass and sexist" and that her complaints to Martin had "fall[en] on deaf ears." *Id.* at 227. Musa-Muaremi stated that "some things [had] happened" while she was with Fordyce in Miami. *Id.* at 228. She did not provide specific details. Musa-Muaremi also told Majka that Fordyce "made comments" and was "overly sexual with some of the girls in the office." *Id.* at

---

[6] Martin, on the other hand, testified that Musa-Muaremi never complained to him about any sexual comments, incidents of sexual harassment, or incidents regarding sex-based conversations prior to May 1, 2007. Def.'s Ex. 12 ¶¶ 10–14.

227. Majka told Musa-Muaremi to document Fordyce's behavior in the future and that she "was going to look into it." *Id.* at 229–230. Musa-Muaremi told Majka that she "was going to appeal to Michael [Martin] one last time because [she] couldn't tolerate it any more and [she] wasn't the only one experiencing all of this." *Id.* at 229. Musa-Muaremi did not tell Majka that she was making a sexual harassment complaint. *Id.* at 230.

### C.    Cindy Rapshus's Complaints

Cindy Rapshus started work at FTD in January of 2007 as Vice President of Business Development. Although Rapshus did not work in the same department as Musa-Muaremi, her desk was near Musa-Muaremi's and Fordyce's desks. In February 2007, Rapshus complained to Martin about Fordyce's behavior. Pl.'s Ex. 31 at 70–71. She told Martin that Fordyce's behavior was not professional and that he used inappropriate language and conduct when he talked to suppliers on the phone. Rapshus described one incident when Fordyce was talking on the phone with a supplier and was "asking her what she did with her husband or boyfriend . . . and what they did on their date." *Id.* at 37. Rapshus thought that the conversation had sexual overtones but she couldn't hear what the supplier on the other end of the phone was saying. Rapshus also thought that Fordyce had a "foul mouth" in that he often used the words "fuck" and "suck" with employees in the office and while he was on the phone. These complaints were not focused on Fordyce's treatment of Musa-Muaremi. Rather, Rapshus wanted to note Fordyce's "erratic behavior . . . berating of people . . . how loudly he communicated and [that he] was often very rude and inconsiderate." *Id.* at 74. Raphshus did not state that she was making a complaint pursuant to FTD's sexual harassment policy.

Sometime in 2007, Rapshus communicated with the Human Resources Department about Fordyce's behavior. *Id.* at 74–75. She also described certain "concerns that [she] had regarding what was going with [Musa-Muaremi]." *Id.* at 22. Rapshus had witnessed Fordyce pull Musa-Muaremi aside into a different area and yell at her. Rapshus also saw Fordyce stand near Musa-Muaremi, point at her and say, "You," and then point where he wanted her to go. *Id.* at 23.

In May 2007, Rapshus complained to Ben Pauley, the CEO of FTD, about Fordyce's behavior. Rapshus told Pauley that Fordyce had "hauled [Musa-Muaremi] off to another area of the building" and that she could not "stand by and continue to watch Andrew Fordyce treat people – Nadia in particular – like this." *Id.* at 73. Rapshus told Pauley that she thought that there was going to be a "bigger problem than just Nadia" if FTD did not "do something about Andrew." *Id.* at 73. Pauley told her to "take it up with HR." *Id.* at 74.

### III. Musa-Muaremi's May 1, 2007 Grievance

On May 1, 2007, Musa-Muaremi submitted a six page type-written complaint to Weld, in the Human Resources Department, asserting that Fordyce had subjected her to various forms of verbal abuse. The detailed allegations in the complaint include:

- Fordyce used the word "bitch." On one occasion, after a conversation with a grower, Fordyce turned to Musa-Muaremi and said, "What a bitch!" Musa-Muaremi told him that the comment was inappropriate and Fordyce replied that some females are "sour and can be bitchy." Fordyce then said, "You know you're a bitch." Musa-Muaremi told him not to say it again. On another occasion, Fordyce told Musa-Muaremi not to "be such a bitch" when he overheard her on the phone with a discourteous airline representative. Musa-Muaremi told him that she took offense to his comments and he responded, "[I]f I was someone on the other end of the line I would say you are a[] f-in bitch." On a third occasion, Fordyce said that Musa-Muaremi was being "such a bitch about things."

- Fordyce yelled at Musa-Muaremi in front of other employees and said, "Next time I have a problem with you I will pull you by your little curls into a conference room and we can hash it out there."

- Fordyce snapped his fingers and pointed at where he wanted Musa-Muaremi to go. He also yelled her name loudly to get her attention instead of walking over to her.

- While Fordyce was with Musa-Muaremi on a business trip in Miami, he discussed a party at North Beach and said, "I heard that some of our girls were drinking Purple Hooters . . . but I don't want people around the company to think my girls are loose. Its [sic] okay to drink as long as no bras or panties come off."

- Fordyce compared Musa-Muaremi's appearance to another employee and stated, "[The other employee] is thin, cute you know the cheerleader body and will get far in any job. You on the other hand I don't find attractive but that's okay because some people do. Don't get me wrong . . . [the other employee] is the package."

- Fordyce told Musa-Muaremi that she should "tame" her curly hair and wear it straight because it looked more professional.

- While they were on a business trip in Miami, Fordyce asked Musa-Muaremi why she was "uptight." He stated, "If something is bothering you . . . tell me. I need to make sure that my employees are physically, emotionally and sexually happy." Musa-Muaremi told him that she didn't want to talk about her personal life.

- Fordyce had a sexually explicit phone conversation with a female recruiter.

- In Musa-Muaremi's presence, Fordyce referred to other employees as "retarded, dumb, stupid, sad, sneaky, loser, bitch, kiss-ass, and annoying." He favored some female employees over others.

- When Musa-Muaremi wanted to send an email to 32 growers instead of calling all of them individually, as Fordyce instructed, Fordyce got angry and began to clench his first and repeatedly punch his left hand into his palm.

- Musa-Muaremi heard from Fordyce that he had told two employees to "[g]et your ass out of bed and do your fucking jobs" when they failed to come to work for voluntary overtime for the Mother's Day holiday.

- Fordyce allowed some employees to take undocumented time off, long lunches, and allowed them to leave work early to get cocktails.

Musa-Muaremi told Weld that what she had written down in the complaint was the "G-rated version" of what she had overheard Fordyce say during his phone conversations. Def.'s

Ex. 1 at 253.  She also told Weld that Fordyce had told Sara Fett and Kristin Esposito that they "were rolling around in bed and playing around with their boyfriends" while he was on the phone with them.  Musa-Muaremi did not provide any details regarding the other conversations to Weld. Weld told Musa-Muaremi that the complaint was serious and that FTD would conduct an investigation into her allegations in accordance with the company's anti-harassment policy.

After Musa-Muaremi turned in her complaint to the Human Resources Department, she returned to her desk to work.  Sometime that afternoon, she heard Fordyce talking "really loudly" to someone on the phone and she asked him to get off the phone.  Fordyce started yelling at Musa-Muaremi, allegedly because she had done something wrong on a project.  He told her to follow him to a different part of the FTD office so that their conversation would not be overheard.  Once there, Fordyce told Musa-Muaremi that she was acting strangely and asked where she had been that morning.  Fordyce told Musa-Muaremi, "This is it.  Either you tell me everything or that's it and you're done."  *Id.* at 367.  Musa-Muaremi lied about where she had been because she didn't want Fordyce to know that she had talked to the Human Resources Department about his conduct.  Musa-Muaremi then asked if she could leave for the day, stating that she needed to study for a class.  Fordyce approved the time off and she left for the day after she had finished her work.  *Id.* at 274–76.

That afternoon, Musa-Muaremi sent an email to Weld stating, "For the first time in my professional career – I had to physically remove myself and leave work due to the verbal and emotional abuse of . . . my 'Manager.'  This afternoon I was once again subjected to Andrew's antics. . . . If I didn't leave I wouldn't have been able to work.  I'm exhausted and physically drained and I realize that this is just the beginning."  Pl.'s Ex. 21.

Later that day, Rapshus sent an email to Weld that stated that she had just encountered Musa-Muaremi as she was leaving the office after another "Andrew episode." Pl.'s Ex. 4. Rapshus wrote that she knew that Musa-Muaremi had filed a complaint with the Human Resources Department that morning and that she had talked to Musa-Muaremi for almost an hour regarding "the situation" on the previous day. Pl.'s Ex. 33 at 146–47; Pl.'s Ex. 4. Rapshus stated that she had "mentioned [the situation with Fordyce] to Ben Pauley a bit ago because I have witnessed Andrew's behavior and intimidation tactics on a number of occasions and quite honestly, something needs to be done about his language and his apparent lack of management skills." Pl.'s Ex. 4.

Fordyce was out of the office on a business trip to Miami from May 2 through May 12. On May 9, Fordyce talked to Musa-Muaremi on the phone and said that he had heard from "the girls" that Musa-Muaremi had submitted a complaint and that FTD had opened an investigation. Fordyce said, "I want to know what's in that document." He continued, "No, I don't want to know, and I'm not even supposed to be talking to you. We need to do this and we need to finish the work and that's it." Def.'s Ex. 1 at 278. Fordyce didn't mention anything else about the complaint during their conversation.[7]

During the same time period, Martin told Musa-Muaremi that he wanted to take her out to lunch to discuss some work issues that were relevant to the upcoming Mother's Day holiday. At lunch, Martin asked Musa-Muaremi, "So what is this rumor I hear about some multipage document floating around that you gave to HR?" *Id.* at 393. Musa-Muaremi told Martin that she

---

[7] Musa-Muaremi also testified that she overheard other employees stating that they had heard that Fordyce was "pissed off" as a result of the complaint and that he was "going to get back at [Musa-Muaremi] for it." Def.'s Ex. 1 at 394–95. These statements are hearsay and will not be considered by the court.

had filed a formal complaint about Fordyce's conduct. Martin then asked about certain aspects of her complaint that were related to him. *Id.* at 394.

On May 9, Martin talked to Musa-Muaremi again about the investigation. He approached Musa-Muaremi at her cubicle at about 6:00 PM, after all of the other employees except for Jensen had gone home from work. Martin told Musa-Muaremi that when Fordyce came back to the office she wouldn't "want to be here anyway . . . . You want to look for another job because he will make sure that your work reflects how he feels." *Id.* at 387. Martin offered Musa-Muaremi two to three weeks of paid leave to look for another job. *Id.* at 386. Martin stated that there was "nothing he could do about it" and that even if he left the company, Fordyce would probably get promoted to his position. *Id.* at 387.

On May 14, Musa-Muaremi emailed Fordyce and requested the next day off from work. Fordyce replied, "it's okay for you to take tomorrow off. It's no problem. Thanks for letting me know." *Id.* at 297–98.

## IV. FTD's Investigation of Musa-Muaremi's Grievance

After Musa-Muaremi submitted her complaint, Weld and Majka reviewed the allegations in detail with Larry Johnson, the Executive Vice President of the Florist Segment and supervisor over the Human Resources Department. Over the course of the next two weeks, Majka and Weld interviewed thirteen employees in the Fresh Flowers Department. They asked questions based on a form that had been drafted by Weld and Majka in consultation with FTD's inside and outside counsel. Pl.'s Ex. 35 at 72. Employees were told that the Human Resources Department wanted to talk to them "regarding the Fresh Flowers division to get a general feel of the atmosphere and the department." Pl.'s Ex. 22 at 1. The form comprised the following questions:

- How would you describe your work environment?
- Do you feel your work environment is hostile?
- Who is your direct manager?
- Do you feel that your dealings with your manager is [sic] fair?
- Do you have any obstacles in your department?
- Describe the morale of your team?
- Any other comments?

Pl.'s Ex. 22 at 1.  Weld and Majka took notes on the employees' responses and then discussed the results of the interviews.

Weld, at her deposition, provided testimony regarding comments made by several employees during the interviews.  Aimee Bachman told Weld that Fordyce "pick[ed] on people," Musa-Muaremi in particular, snapped his fingers, and that Fordyce allowed favorite employees to take undocumented time off, long lunches, and leave early for cocktails.  She also stated that he had "no interest in [her] growth [because] I am not 23 and a size 2."  Pl.'s Ex. 33 at 58–64. Weld concluded that these statements did not substantiate the claims in Musa-Muaremi's grievance because they could have been "hearsay" statements relayed to Bachman by Musa-Muaremi.  *Id.* at 61–63.  Weld believed that Musa-Muaremi and Bachman were friends and that it was possible that Bachman's statements were based on hearsay.  She did not, however, ask Bachman any follow-up questions that might have confirmed the source of her information.

Michelle Moomaw stated that Nadia had been yelled at by Fordyce and that she had seen other employees treated badly.  *Id.* at 67.  Sonia Sandoval stated that Fordyce gave preferential treatment to two female employees and that the situation in the office amounted to "Andrew, Shannon, Kristin, favorites versus everyone else."  *Id.* at 68.  Tiffanie Hardekopf stated that Fordyce had "called [Musa-Muaremi] a bitch a few weeks ago" and that Fordyce had "favorites on the team."  *Id.* at 70.

James Majka, the brother of Amy Majka, also told Weld that Fordyce had called Musa-Muaremi a bitch. *Id.* at 72. He stated that Fordyce "ha[d] it out for [Musa-Muaremi]" and that he treated her badly. *Id.* Weld testified that she did not believe that James Majka's statements confirmed the assertions in Musa-Muaremi's grievance because his statement that Fordyce "has it out for Nadia" might not mean the same thing as being "singled out," which is what Musa-Muaremi had written on her grievance. *Id.* at 73. James Majka also stated that Fordyce would pound his fists when he was frustrated and that Fordyce had a discussion with Musa-Muaremi where he yelled and swore at her and she had tears in her eyes. *Id.* at 75. Weld testified that these statements did not confirm the allegations in Musa-Muaremi's grievance because Musa-Muaremi had brought a sexual harassment complaint and these actions did not amount to harassment. *Id.* at 75–76. Rather, they were "unprofessional behavior." *Id.* at 76.

Johnson, Weld, and Majka interviewed Martin and Fordyce regarding the allegations in Musa-Muaremi's complaint. Fordyce denied making any sexual comments to Musa-Muaremi, engaging in sexually explicit conversations on the phone at work, making comments that he preferred to hire females, or calling Musa-Muaremi a bitch. Fordyce also denied that he had singled out Musa-Muaremi for unfavorable treatment or that he had been rude to her. Indeed, at one point he stated that he was offended by the line of questioning and told the interviewers that they were "full of shit." Pl.'s Ex. 33 at 96.

Weld did not interview Rapshus as part of the internal investigation of Fordyce because Rapshus was not in the Fresh Flowers Department and because she traveled frequently for work. Pl.'s Ex. 33 at 83–84. In addition, Rapshus's May 1 email did not say that she had witnessed harassing conduct that was specifically directed towards Musa-Muaremi. Majka similarly

18

testified that she did not interview Rapshus because Rapshus was not a witness to any harassment directed at Musa-Muaremi.  Pl.'s Ex. 35 at 54.

**V.        May 17 and May 21 Meetings and Resignation**

On May 17, 2007, Johnson, Majka, and Weld met with Musa-Muaremi to explain the results of the investigation to her.  They stated that they had not been able to substantiate her allegations of sexual harassment or sex discrimination but that Fordyce had engaged in unprofessional conduct.  Fordyce and Martin would have to undergo Management Training, which would include review of FTD's anti-harassment policy.  In addition, Human Resources would monitor all of Fordyce's one-on-one and group meetings with employees.  Musa-Muaremi would still have to report to Fordyce as her supervisor.

Musa-Muaremi stated that she did not believe that Fordyce's behavior would change and that she did not believe that FTD was going to be able to monitor all of Fordyce's conduct unless someone followed him all the time.  Def.'s Ex. 1 at 282–83.  Musa-Muaremi stated that she would need some time to consider whether she wanted to continue working at FTD, given that she would still have to report to Fordyce as her supervisor.  Musa-Muaremi was given the rest of the week off from work.

The next day, May 18, Fordyce received a Final Written Warning for his unprofessional conduct in the workplace.  The Final Written Warning gave Fordyce a 90-day probationary period, required Fordyce to attend Management Training, which included anti-harassment training, required that the Human Resources Department monitor any one-on-one meetings between Fordyce and the employees he supervised, and stated that any further instances of misconduct would result in further discipline, including termination.

19

That same day, Musa-Muaremi received an email from Lealoni Hemphill, who worked for one of FTD's vendors and was a good friend and former employer of Fordyce. Hemphill accused Musa-Muaremi of having made a mistake on a project and copied several other employees on the email, including Fordyce. Musa-Muaremi concluded that Hemphill's email was a form retaliation for having complained about Fordyce because Fordyce was working on-site at Hemphill's office in Miami at that time. She forwarded the email to Weld and Majka.

On May 21, 2007, Musa-Muaremi met with Johnson and stated that she did not want to report to Fordyce and asked if there were any other positions available in the company. Johnson stated that she would not be able to change positions. Musa-Muaremi told Johnson that she had "no choice but to resign" because she could not continue working in a hostile work environment. Def.'s Ex. 1 at 288. She told Johnson about the email from Hemphill and said that if it was a "taste of what's to come, I don't want to be a part of it." *Id.* at 435–36. She also told Johnson that Martin had told her that Fordyce would try to "make [her] job here really difficult" as a result of the complaint and that she was fearful for her job. *Id.* at 436.

On May 25, 2007, Musa-Muaremi filed a charge of discrimination with the Equal Employment Opportunity Commission alleging gender discrimination, sexual harassment, and retaliation. She filed her complaint on March 24, 2009.

## DISCUSSION

### I.  *Quid Pro Quo* **Harassment**

FTD argues that there is insufficient evidence to support Musa-Muaremi's claim for *quid pro quo* harassment. "*Quid pro quo* harassment occurs in situations where submission to sexual demands is made a condition of tangible employment benefits." *Bryson* v. *Chicago State Univ.*,

96 F.3d 912, 915 (7th Cir. 1996). Musa-Muaremi argues that she was denied bonuses, undocumented time off, preferential schedules, cocktails, and free food because she was unwilling to participate in Fordyce's sexual banter. As a threshold issue, this conclusion is without evidentiary support. Moreover, Fordyce's vulgar comments cannot reasonably be construed as an "effort . . . to extract sexual favors by threats or promises." *DeClue* v. *Cent. Ill. Light Co.*, 223 F.3d 434, 437 (7th Cir. 2000). Indeed, the Seventh Circuit rejected a nearly identical theory of liability in *Brill* v. *Lante Corporation*, 119 F.3d 1266 (7th Cir. 1997), where the plaintiff asserted that she had been fired for refusing to act as "one of the boys" as a condition of her employment. The court of appeals "decline[d] to blur the line between hostile environment and *quid pro quo* harassment such that a plaintiff encountering vulgar banter could file either type of claim though no sexual advance was ever issued to her." *Id.* at 1274. FTD's motion for summary judgment on Musa-Muaremi's claim for *quid pro quo* harassment will be granted.

## II.     Hostile Work Environment

To establish a prima facie case for a hostile work environment within the meaning of Title VII, Musa-Muaremi must show that (1) "she was subjected to unwelcome harassment," (2) "the harassment was based on her sex," (3) "the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere," and (4) "there is a basis for employer liability." *Kampmier* v. *Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007). FTD argues that Musa-Muaremi has not met the second, third, or fourth requirements.

### A.     Harassment Based on Sex

At the least, an issue of fact exists as to whether Fordyce's conduct towards Musa-Muaremi was based on her gender. Fordyce asked Musa-Muaremi about her sex life, asked whether she planned on getting pregnant, stated that women could not be "breadwinners" or get promotions, and told her that she needed to lose weight because "the Coke bottle shape" was "out." He also referred to a female employee's breasts, discussed female employees' sex lives, teased Musa-Muaremi about working at a strip club, and made a sexual reference to his genitalia. There is no evidence that Fordyce's rude comments to male employees had a similarly sexual component. Therefore a jury could reasonably conclude that Fordyce's conduct was based on Musa-Muaremi's gender.

### B.      Severe or Pervasive Harassment

An issue of fact also exists as to whether Fordyce's conduct was sufficiently severe or pervasive to create a hostile work environment.  A hostile work environment exists when an employee is subject to conduct that is both objectively and subjectively offensive.  *Rhodes* v. *Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004).  FTD does not contest that Musa-Muaremi found Fordyce's conduct to be subjectively hostile.  To determine whether Musa-Muaremi's work environment was objectively abusive or hostile, the court must consider the totality of circumstances, "including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work."  *Valentine* v. *City of Chicago*, 452 F.3d 670, 681 (7th Cir. 2006) (quoting *Wyninger* v. *New Venture Gear, Inc.*, 361 F.3d 965, 975–76 (7th Cir.2004)).

Courts usually focus on whether verbal harassment was accompanied by an "inappropriate touching" in determining if the conduct created an objectively hostile working environment.  *See Turner* v. *The Saloon, Ltd.*, 595 F.3d 679, 685–86 (7th Cir. 2010).  Fordyce never touched plaintiff, however.  She asserts that he would snap his fingers and point where he wanted her to go and slap his fist into his palm.  Although disrespectful, these actions are not inherently sexual,[8] and there is evidence that Fordyce punched his fist into the palm of his hand when he was near male employees.

When analyzing sexual harassment claims based on verbal conduct alone, courts look to factors such as whether the harasser threatened the plaintiff, whether he solicited her to have sex

---

[8] Musa-Muaremi also asserts that Fordyce "threatened to drag her by her hair," but this is supported only by citation to paragraph 9 of her statement of material facts, which has been stricken for failure to comply with Local Rule 56.1.  *See* Minute Order dated Oct. 5, 2011.

with him, or whether his comments demonstrate "anti-female animus." *See, e.g.*, *Boumehdi* v. *Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007); *Baskerville* v. *Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). The court must also examine whether the statements were made directly to the plaintiff or to other employees. *Dandy* v. *United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004).

Musa-Muaremi has submitted evidence that Fordyce called her a "bitch," stated that women can't be "breadwinners," implied that she worked as a stripper, asked whether she was "sexually happy," engaged in sexually explicit phone calls that he knew she could overhear, told her that she had a "Coke bottle body," used crass language such as "rape," and made sexual comments about other female employees. These comments were sexist and vulgar and would offend many reasonable women. Each time Musa-Muaremi told Fordyce that she was offended by his behavior, however, she was either ignored or insulted. In addition, Fordyce belittled Musa-Muaremi in front of other employees by yelling at her and snapping his fingers at her and pointing to where he wanted her to go. The evidence suggests that Musa-Muaremi was not the only employee who concluded that she was being singled out by Fordyce: Cindy Rapshus and James Majka also told the Human Resources Department that they were concerned about Fordyce's treatment of Musa-Muaremi as compared to other employees. Finally, Fordyce made comments to other employees that were offensive to women generally and therefore fell with the "target area of offending conduct." *Yuknis* v. *First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007) (directing courts to avoid the term "secondhand harassment" and instead consider whether speech directed to individuals other than the plaintiff falls "within the target area of the offending conduct – if, for example, the speech or conduct is offensive to women and one is a

24

man"); *Boumehdi*, 489 F.3d at 788 (comments reflecting "anti-female animus" were sufficient to support hostile work environment claim).

FTD argues that Fordyce's comments, though inappropriate, fall within what has been referred to as the "safe harbor" for "tepid or intermittent conduct." *Galloway* v. *Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996). Given the circumstances of Musa-Muaremi's supervision by Fordyce, however, this is a question for the jury to decide. Musa-Muaremi's desk was located in close physical proximity to Fordyce's desk and she received assignments from him on a daily basis. Thus there was no way to avoid or mitigate much of Fordyce's harassing conduct. In addition, whether or not Fordyce had the power to terminate employees, he had significant influence over their day-to-day work activities and, ultimately, their performance reviews with upper management. The pervasiveness of Fordyce's demeaning conduct, taken together with his significant managerial role, distinguishes Musa-Muaremi's case from those that involve "occasional vulgar banter" and coarse, but not humiliating, conduct. *Cf. Baskerville*, 50 F.3d at 430, 431 (no objectively hostile work environment where supervisor called employee a "pretty girl," made grunting noises as she left his office wearing a leather skirt, told her that his office did not get "hot" until she stepped into it, joked that "all pretty girls [should] run around naked, and made gestures suggesting masturbation); *McPherson* v. *City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004) (supervisor's "limited and infrequent" inquiries about what color bra employee was wearing, using a suggestive tone of voice in asking whether he could "make a house call" when she called in sick, and pulling back her tank top with his fingers on one occasion did not create an objectively hostile work environment); *Adusumilli* v. *City of Chicago*, 164 F.3d 353, 361–62 (7th Cir. 1998) (supervisor's teasing about waving at

squad cars, ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched employee's arm, fingers, or buttocks were not actionable).  Drawing all the inference in Musa-Muaremi's favor, a reasonable jury could conclude that Fordyce's repeated and offensive conduct affected the terms of Musa-Muaremi's employment with FTD.  Therefore a genuine issue of fact exists as to whether Fordyce's conduct was so severe and pervasive as create a hostile work environment.

### C.    Employer Liability

Musa-Muaremi must demonstrate that FTD is vicariously liable for Fordyce's conduct in order to prevail on her hostile work environment claim against FTD.  "An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee."  *Johnson* v. *West*, 218 F.3d 725, 730 (7th Cir. 2000) (citing *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 766, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)).  Strict liability applies when the supervisor's harassment results in a tangible employment.  *Id.* at 730.  If no tangible employment action occurred, an employer may avoid vicarious liability by showing "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Id.* (citing *Faragher*, 524 U.S. at 789, 808) (internal quotation marks and citations omitted).  For conduct by a co-worker, as opposed to a supervisor, an employer will be liable if it "was negligent either

in discovering or remedying the harassment." *Hall* v. *Bodine Elec. Co.*, 276 F.3d 345, 356 (7th Cir. 2002) (internal quotation marks and citations omitted).

### i.     Supervisory Authority

The parties dispute whether Fordyce's conduct should be analyzed pursuant to the theory of supervisor liability set forth in *Ellerth* and *Faragher* or under the negligence standard for co-worker harassment.  FTD has presented undisputed evidence that Fordyce did not have the actual authority to hire, fire, and discipline employees.  It urges the court to apply the negligence standard on the grounds that Fordyce was not Musa-Muaremi's supervisor.  FTD may, however, be held liable for Fordyce's actions under the principle of apparent authority if Fordyce "purport[ed] to exercise a power which he . . . [did] not have."  *Ellerth*, 524 U.S. at 759; *Parkins* v. *Civil Constrs. of Ill., Inc.*, 163 F.3d 1027, 1033 (7th Cir. 1998).  Musa-Muaremi and two other employees testified that they believed that Fordyce had the authority to fire and discipline employees. They further testified that Fordyce threatened employees with termination. Given that Fordyce had the power to recommend termination, and that he was in charge of Musa-Muaremi's day-to-day work assignments, this evidence is sufficient to create an issue of fact as to whether a reasonable employee would have believed that Fordyce had supervisory authority for the purpose of imputing liability to FTD.  *See Gawley* v. *Ind. Univ.*, 276 F.3d 301, 311 (7th Cir. 2001) ("If [a supervisor] was entrusted with powers that rendered subordinates less likely to blow the whistle on him, then he was aided by the agency relationship in harassing subordinate employees."); *see also Doe* v. *Oberweis Dairy*, 456 F.3d 704, 716–18 (7th Cir. 2006) ("no compelling need to make a dichotomous choice" between strict liability and negligence where employee has some, but not all, powers of the "paradigmatic" supervisor).

The court will therefore consider whether FTD should be held strictly liable or whether it may assert an affirmative defense under *Ellerth* and *Faragher*.

### ii. Tangible Employment Action

An employer is only strictly liable for harassment inflicted by a supervisor where the supervisor's harassment culminated in a tangible employment action. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. A tangible employment action typically takes the form of termination, failure to promote, reassignment with significantly different responsibilities, or "a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. A tangible employment action may also take the form of constructive discharge, but only if the discharge resulted from an "official act" by a supervisor. *Penn. State Police* v. *Suders*, 542 U.S. 129, 147–48, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004); *Robinson* v. *Sappington*, 351 F.3d 317, 336 (7th Cir. 2003). If, on the other hand, the constructive discharge was caused by coworkers or other individuals without supervisory authority, an employer may still assert an affirmative defense under *Ellerth/Faragher*. *Suders*, 542 U.S. at 148.

Musa-Muaremi argues that the requirement that she continue to reporting to Fordyce, even after FTD's investigation of her complaint, amounts to an adverse employment action or, "in the alternative," constructive discharge. Constructive discharge is not an "alternative" to an adverse employment action, but rather is one of the forms that an adverse employment action can take. Furthermore, there is no evidence that any other type of adverse employment action took place. Musa-Muaremi was not terminated, demoted, reassigned to a different job with different responsibilities, or deprived of material job benefits. The alleged tangible employment action in this case is constructive discharge.

Constructive discharge occurs when "an employer makes an employee's working conditions so intolerable that an employee is forced into involuntary resignation." *Roby* v. *CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009). "[W]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress." *Tutman* v. *WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). Whether an employee's work environment meets the standard for constructive discharge is determined from the perspective of a reasonable employee. *Roby*, 579 F.3d at 785. The court must also assess the reasonableness of the employer's response to the harassing conduct. *Porter* v. *Erie Foods Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009).

Musa-Muaremi testified that she complained to Martin several times about Fordyce's conduct, beginning in February 2007, and that she told Martin that Fordyce had called her a "bitch." Musa-Muaremi testified that Martin responded that she should "manage" Fordyce. On another occasion, Musa-Muaremi complained to Martin about Fordyce's sexually explicit phone calls. Martin said that he had already discussed the conversation with Fordyce, but did not promise any additional follow-up. Musa-Muaremi also testified that she complained to the Human Resources Department several times between February and April 2007, stating that Fordyce made inappropriate comments and used the word "bitch." Only by investigating the context of these comments could FTD have determined whether Fordyce's use of the word "bitch" amounted to sexual harassment or not. Indeed, Musa-Muaremi had also previously complained about Fordyce's pregnancy comment during her interview, which might suggest that

there was a sexual component to his conduct. Nevertheless, there is no evidence that FTD investigated any of Musa-Muaremi's early complaints.

Then, in April 2007, Musa-Muaremi told Amy Majka, the Director of Human Resources, that Fordyce was "overly sexual" with some of the female employees and reiterated that Fordyce made inappropriate comments. She also said that she had complained to Martin but that the behavior continued. Majka told Musa-Muaremi that she would "look into it," but there is no evidence that any investigation occurred until Musa-Muaremi turned in her written complaint on May 1. After Musa-Muaremi submitted her written complaint, FTD's Human Resources Department did not interview her or ask her to elaborate on the substance of her allegations. Nor did FTD ask for the names of potential witnesses. Later on, Musa-Muaremi sent an email to the Human Resources Department that stated that she believed that Fordyce had once again harassed her. FTD conducted no follow-up, despite the explicit anti-retaliation provision in its sexual harassment policy. Musa-Muaremi was, however, questioned by Fordyce and Martin about the substance of her complaint. Their comments suggest a lack of professionalism and respect for the confidentiality and sensitivity of a sexual harassment complaint. In addition, while the investigation was ongoing, Martin approached Musa-Muaremi and told her to look for another job because Fordyce "will make sure that your work reflects how he feels." He also said that there was "nothing he could do" about Fordyce's conduct and that Fordyce would probably become the Director of Fresh Flowers if Martin were to leave FTD.

Under these circumstances, a reasonable employee could have concluded that she had no choice but to resign, rather than continue to report to her harasser. *See Boumehdi*, 489 F.3d at 790 (employee was constructively discharged when she presented evidence of retaliatory actions

after she complained to human resources and her employer failed to respond despite repeated complaints of sexual harassment).  FTD's delay in responding to Musa-Muaremi's complaints, both before and after her May 1 grievance, suggests that FTD's corrective action was not reasonable.  *See Porter*, 576 F.3d at 636 (prompt investigation is the "hallmark of a reasonable corrective action" (citation omitted)).  Equally significant is Martin's comment that Musa-Muaremi should look for another job and that he could do "nothing" about Fordyce's conduct as a manager.  Martin made this comment in his official capacity as the Director of Fresh Flowers and as Fordyce's supervisor, and as such it suggests that Fordyce's actions were sanctioned by FTD.  *See Robinson*, 351 F.3d at 337 (supervisor's indication that it was in employee's "best interest to resign" had "added effect because [supervisor] was speaking in his official, supervisory capacity when the suggestion was made" and could support constructive discharge claim).  In addition, Musa-Muaremi testifies that, when she met with the Human Resources Department on May 21 she told Johnson that Martin said that Fordyce would "make her job . . . really difficult."  She also told Johnson that she feared for her job.  FTD should have investigated these statements because the success of any corrective action would have been dependent, in part, on Martin's willingness to monitor and discipline Fordyce.  Martin's comment also raises concerns about future retaliation by Fordyce, which would have been a clear violation of FTD's written harassment policy.  The fact that FTD did not investigate this new allegation, but instead accepted Musa-Muaremi's resignation, lends further support to the conclusion that additional misconduct would have been condoned.  Finally, Weld's testimony suggests that FTD applied an exceedingly stringent standard in evaluating the merits of Musa-Muaremi's written complaint.  More than one employee stated during the investigation

interviews that Fordyce had favorite employees, mistreated Musa-Muaremi, and called her a "bitch." FTD has not demonstrated that Weld's decision not to ask follow-up questions, in at least one instance because she determined that an employee may have been reciting "hearsay," was reasonable under the circumstances.

For all of these reasons, a genuine issue of fact exists as to whether Musa-Muaremi was constructively discharged and whether FTD may be held strictly liable for Fordyce's conduct. FTD's motion for summary judgment with respect to Musa-Muaremi's hostile work environment claim must be denied. The court need not consider whether FTD can mount a successful affirmative defense under *Ellerth* and *Faragher*. *See Robinson*, 351 F.3d at 337 n.13.

## III.    Sex Discrimination

To establish sex discrimination under Title VII, Musa-Muaremi may proceed either directly, by presenting direct and/or circumstantial evidence of discriminatory intent, or indirectly, by utilizing the burden-shifting method established by *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under the direct method, Musa-Muaremi may prove her case through direct evidence (such as an admission by the decisionmaker that his actions were based on unlawful animus) or through circumstantial evidence, "i.e., evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Rogers* v. *City of Chicago*, 320 F.3d 748, 753–54 (7th Cir. 2003); *Alexander* v. *Wisc. Dep't of Health & Family Servs.*, 263 F.3d 673, 682 (7th Cir. 2001). Under the indirect method, Musa-Muaremi must first make out a prima facie case for discrimination by showing that (1) she is a member of a protected class, (2) she met FTD's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not in the

protected class were treated more favorably. *See Scaife* v. *Cook Cnty.*, 446 F.3d 735, 739 (7th Cir. 2006). Musa-Muaremi does not state which method she proceeds under, but she fails to establish a *prima facie* case using either method of proof.

Musa-Muaremi has not demonstrated that similarly situated male employees were treated more favorably than she was, a requirement under the indirect method of proof. The evidence that she cites in support of her sex discrimination claim, which relates to the termination of James Majka and Martin, is inadmissible. The relevant statements of fact have been stricken from her Local Rule 56.1 statement. *See* Minute Order dated Oct. 5, 2011. In addition, Musa-Muaremi has not demonstrated that either Majka or Martin were similarly situated employees. A plaintiff must show that similarly situated employees were "comparable to the plaintiff in all *material* respects." *Crawford* v. *Ind. Harbor Belt Ry. Co.*, 461 F.3d 844, 846 (7th Cir. 2006). The similarly situated requirement is flexible, but there must be enough evidence to perform a "meaningful comparison . . . one which serves 'to eliminate confounding variables, such as differing roles, performances histories, or decision-making personnel.'" *Argyropoulos* v. *City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) (quoting *Humphries* v. *CBOS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). Musa-Muaremi has presented no information about either Martin or Majka that would allow the court to make these comparisons. Accordingly, Musa-Muaremi cannot proceed under the indirect method of proof.

In the section of her memorandum addressing her sex discrimination claim, Musa-Muaremi does not argue that she suffered an adverse employment action, a requirement under both the direct and indirect methods of proof. In a different section of her memorandum she asserts, as a section header, that "Constructive Discharge is Adverse Action (for all claims)."

Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. at 22. The text that follows this heading constitutes a response to FTD's argument that Fordyce's sexual harassment did not result in an adverse employment action. Thus, to the extent that Musa-Muaremi argues that she was constructively discharged in support of her sex discrimination claim, her claims for hostile work environment and sex discrimination are one and the same. *See Bright* v. *Hill's Pet Nutrition, Inc.*, 342 F. App'x 208 (7th Cir. 2009) ("A hostile work environment is actionable as sex discrimination; there are not distinct 'claims' for hostile work environment and sex discrimination. . . . Constructive discharge likewise is not a distinct claim; it is a theory about how the sex discrimination (= work environment hostile because of the employee's sex) caused harm (by forcing the employee to quit, in order to avoid additional injury)." (citations omitted)). FTD's motion for summary judgment with respect to Musa-Muaremi's sex discrimination claim will be granted in part and denied in part. Musa-Muaremi may not assert a claim for sex discrimination other than the hostile work environment claim discussed above.

## IV.    Retaliation

To establish retaliation, Musa-Muaremi may proceed either directly, by presenting direct and/or circumstantial evidence of discriminatory intent, or indirectly, by utilizing the *McDonnell Douglas* burden-shifting method. Under either method, Musa-Muaremi must show that she suffered an adverse employment action. *See Rogers*, 320 F.2d at 753–54. In addition, under the indirect method, Musa-Muaremi must show that (1) she engaged in a protected activity, (2) she met FTD's legitimate expectations, and (3) she was treated worse than similarly situated employees who did not engage in the protected activity. *Rogers*, 320 F.3d at 754–55.

Musa-Muaremi argues that Martin and Fordyce retaliated against her when (1) Fordyce asked where she had been on the morning she submitted her grievance and then told her, "Either you tell me or you're done," (2) Martin took her out to lunch and told her that Fordyce would make things difficult for her if she kept working at FTD and offered her time off to look for a new job, and (3) one of FTD's customers sent Musa-Muaremi an email regarding mistakes on one of her projects. None of these actions constitute an adverse employment action because no discipline was issued and there was no loss in benefits. "An unfulfilled threat, which results in no material harm, is not materially adverse." *Ajayi* v. *Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003); *see also Nagle* v. *Vill. of Calumet Park*, 554 F.3d 1106, 1121 (7th Cir. 2009) (discussion of a suspension that was never actually served was not a materially adverse action). Therefore Musa-Muaremi cannot bring a retaliation claim based on Fordyce's or Martin's conduct.

Musa-Muaremi does not argue that she was constructively discharged in retaliation for having filed a complaint about Fordyce's conduct. Her assertion that "Constructive Discharge is Adverse Action (for all claims)" is plainly insufficient, given that all of the facts that follow relate only to her hostile work environment claim. Moreover, Musa-Muaremi must provide at least some circumstantial evidence that the "decisionmaker" behind the adverse employment action acted for a prohibited reason. *See Rogers*, 320 F.3d at 754. Musa-Muaremi does not argue or cite any evidence members of the Human Resources Department decided that she should continue reporting to Fordyce because they were motivated by retaliatory animus. Because Musa-Muaremi has not demonstrated that she suffered an adverse employment action as

a result of having engaged in a protected activity, FTD's motion for summary judgment with respect to Musa-Muaremi's retaliation claim will be granted.

**CONCLUSION AND ORDER**

For the reasons discussed above, FTD's motion for summary judgment [#138] is granted as to Musa-Muaremi's retaliation and *quid pro quo* sexual harassment claims and denied as to Musa-Muaremi's hostile work environment claim. FTD's motion for summary judgment as to Musa-Muaremi's sex discrimination claim is granted in part and denied in part. Musa-Muaremi may not assert a sex discrimination claim on grounds other than those set forth in support of her hostile work environment claim. Musa-Muaremi's motion for partial summary judgment [#143] is denied.


Dated: Oct. 5, 2011                    Enter:_____

                                                JOAN HUMPHREY LEFKOW
                                                 United States District Judge